**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:15-cv-00007-MR**
**[CRIMINAL CASE NO. 2:10-cr-00009-MR]**

| | | |
|---|---|---|
| JAMES ERNEST LESPIER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court following an evidentiary hearing on the Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [Civil Case No. 1:15-cv-00007-MR ("CV"), Doc. 1].

**I.      BACKGROUND**

**A.      Mandi Smith's Murder**

On the evening of May 17, 2010, the Petitioner James Ernest Lespier was at his home on the Cherokee Indian Reservation with the victim, Mandi Smith ("Smith"), and their three-year-old son.  [Trial Transcript[1] ("Trial Tr.")

_____

[1] The transcript of the Petitioner's jury trial is filed in Criminal Case No. 2:10-cr-00009-MR as Documents 106 through 112.

at 192, 301-02, 920, 1147].  At 1:16 a.m. the next morning, the Petitioner made a 911 call, stating that Smith had been shot in the back of the head and was dead.  [Trial Tr. at 1102, 1148, 1151- 52].  Officers responding to the call around 1:30 a.m. encountered the Petitioner as he walked out of his home, yelling, crying, and screaming.  [Id. at 189, 193, 220, 241-42, 261-62, 271-72, 280].  The Petitioner "was covered in blood" — on his face, on his abdomen, on his hands, and on his back — and officers were unable to understand much of what he was saying.  [Id. at 193, 219-20, 243, 255, 271].  Officer Manuel Watty testified that upon the officers' arrival at the home, the Petitioner reported that Smith "had shot at him and he tried to get the gun away from her and it went off."  [Id. at 218].

After securing the Petitioner, officers from the Cherokee Police Department went inside the Petitioner's home, where they saw Smith's body, clothed only in her panties, a bra, and socks, one of which was rolled down off of her heel, lying face-up on the floor.  [Trial Tr. at 191, 202].  Smith had blood on and around her head, on the front of her body, and on her back.  [Id. at 191, 282].  John Peterson, one of the paramedics who arrived on the scene, saw a large amount of blood under the back of Smith's head, where she suffered a gunshot wound that was "obvious[ly]" an injury that was "not survivable."  [Id. at 282, 283].  Smith's skin was "mottled," indicating that "the

blood had had time to pull away from her skin and pool in other parts of her body or bleed out completely," and her "skin was . . . white and pasty." [Id. at 283]. In addition to the blood under Smith's head, there was also "a lot of blood around [her] torso" and on the floor, [id.], and, based on "[s]wirl marks in the blood that were somewhat dry," [id. at 296], it appeared as though "it had been cleaned up," [id. at 283]. A .38 caliber revolver was found under Smith's left leg, and a single oxycodone pill, in a plastic baggie, was located near her right armpit. [Id. at 208, 413].

On the seat of a sofa immediately beside Smith's body, officers found a double-barreled shotgun with what appeared to be a fresh crack in the wooden stock. [Trial Tr. at 201, 209, 369, 395, 559-60]. When an agent attempted to open the shotgun to clear it of any ammunition, a five-inch piece of wood from the stock broke off. [Id. at 396-97]. Agents also found blood on the door frame and doorknob leading into the house, blood on the deck leading into the home, and blood on a set of keys in front of the entertainment center in the living room. [Id. at 401-02, 409]. In the driveway connected to Petitioner's home and "jammed up underneath . . . the front end of a car,"

agents found a travel bag with a partially torn strap, containing clothing and make-up belonging to Smith. [Id. at 437-41].[2]

Upon examination of Smith's body, the paramedics and officers found a single gunshot wound on the back of her head, near her neck and to the left of center. [Trial Tr. at 282, 394]. A firearms expert testified that Smith was shot by a revolver, and that at the time of the shot, the muzzle of the revolver was between five and fifteen centimeters from Smith's skin. [Id. at 686, 705-06]. Gunshot residue tests indicated that both Smith and the Petitioner were either in close proximity to a gun being fired or had handled the firearm. [Id. at 724].

Dr. John Davis, the pathologist who conducted Smith's autopsy, testified that because Smith's heart stopped beating immediately, any blood would have drained out only by gravity, not through any spurting or pumping. [Trial Tr. at 641-42, 679]. Dr. Davis testified that someone attempting to

---

[2] In the hours, days, and months following Smith's death, the Petitioner gave officers and others several, conflicting versions of what had happened. For example, the Petitioner initially told officers that he had tried to take a pill from Smith and that when he did so, Smith seized his .38 revolver and started shooting at him. See United States v. Lespier, 725 F.3d 437, 441-42 (4th Cir. 2013) (recounting trial testimony). In subsequent statements, the Petitioner admitted to struggling with Smith and that at some point during their struggle, while Smith was still holding the gun, it discharged. Id. at 442. The Petitioner later admitted, however, that he grabbed the gun shortly before it discharged. Id. at 443. The Petitioner also gave conflicting statements about striking Smith. Id. at 442-43. Significantly, the Petitioner could never explain the angle from which Smith was shot or how that was consistent with his explanation of the events.

perform CPR on Smith would not have become covered with blood – as the Petitioner was -- explaining that there was no source of bleeding on the front of her body.  [Id. at 642-43].

Dr. Davis calculated that the shot that killed Smith was shot from behind her head, traveling in a slightly left to right angle (10 degrees) and in a slightly upward angle (30 degrees).  [Trial Tr. at 632, 665-66].  In addition to the gunshot wound, Smith had what appeared to be fresh abrasions caused by linear abrasive material on the inside of her right forearm, and a "significant localized hematoma" on the top of her head that extended to the surface of her skull.  [Id. at 394, 618-19, 628].  Dr. Davis opined that the strap of the travel bag found underneath the car in the driveway could have caused the abrasions on the inside of Smith's arm, and that the hematoma on Smith's head was fresh and had been caused by something flat, as opposed to something sharp, but not by falling on the floor.  [Id. at 622, 628].  Although no fingerprints were found on the pistol, examiners found the Petitioner's fingerprint on the shotgun stock.  [Id. at 444-45].  Smith's DNA was found in a blood stain on the revolver.  [Id. at 447, 553].

## B.    Pretrial Proceedings

On June 1, 2010, the Petitioner was charged in a Bill of Indictment with second-degree murder, in violation of 18 U.S.C. §§ 1111 and 1153 (Count

One), and with the use of a firearm during and in relation to a crime of violence, namely murder, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1) (Count Two). [Criminal Case No. 2:10-cr-00009-MR-DLH ("CR"), Doc. 5: Bill of Indictment]. Fredilyn Sison of the Federal Defenders of Western North Carolina was appointed to represent the Petitioner.

On November 3, 2010, the parties filed a signed Plea Agreement, pursuant to which the Petitioner agreed to plead guilty to Count One and the Government agreed to dismiss Count Two at the appropriate time. [CR Doc. 13: Plea Agreement]. A Rule 11 hearing was scheduled to take place on November 10, 2010. At that time, however, Ms. Sison appeared with the Petitioner and advised the Magistrate Judge that the Petitioner's family had retained attorney Russell McLean to take over the case. Ms. Sison therefore asked that the Magistrate Judge "strike the Rule 11 hearing from the calendar." [CR Doc. 134 at 3: Rule 11 Transcript]. Mr. McLean confirmed that he and attorney Brad Ferguson had been retained to represent the Petitioner. [Id. at 5]. Mr. McLean further indicated that upon finalizing the fee agreement with the Petitioner's family, he would be filing a general notice of appearance and a motion to continue the trial. [Id. at 4-5]. In light of these developments, the Magistrate Judge continued the Rule 11 hearing. [Id. at 6].

On November 19, 2010, the parties appeared before the Magistrate Judge for a status hearing. Noting that Mr. McLean and Mr. Ferguson had filed notices of appearance, the Magistrate Judge granted Ms. Sison's motion to withdraw. [CR Doc. 135 at 4: Status Hearing Transcript]. Mr. McLean then advised the Magistrate Judge that the Petitioner "desire[d] to withdraw his plea proposal" and proceed to trial. [Id. at 4-5].

On December 7, 2010, the grand jury returned a Superseding Bill of Indictment, charging the Petitioner with first-degree murder, in violation of 18 U.S.C. §§ 1111 and 1153, and with the use of a firearm during and in relation to a crime of violence, namely murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1). [CR Doc. 20: Superseding Bill of Indictment]. Significantly, although the Petitioner had withdrawn his assent to the Plea Agreement and was now charged with a more serious offense, the Government's previous plea offer of a plea to second-degree murder and dismissal of the § 924(c) count remained on the table and was never rescinded. [Evidentiary Hearing Transcript[3] ("T.") at 103].

---

[3] The transcript of the evidentiary hearing is filed in Civil Case No. 1:15-cv-00007-MR as Document 14.

## C.    The Trial

The case proceeded to a jury trial beginning on May 31, 2011.  During the charge conference, and in response to the Government's agreement with the Court's proposed instructions that the jury should be instructed as to both first- and second-degree murder, defense counsel stated that the Petitioner was not "asking for second degree" and that the Petitioner objected to the Government's attempt "to try to change the rules now that they've indicted [the Petitioner] on first degree."  [Trial Tr. at 1259].  When the Court asked defense counsel to clarify whether the Petitioner wanted the case "to go to the jury on first degree and only first degree," defense counsel responded, "[t]hey charged him, we're standing trial for that, and that's what we want." [Id. at 1262].  The Court questioned the Petitioner directly and confirmed that it was the Petitioner's desire that Count One should go to the jury only on first-degree murder, without a charge as to the lesser included offense of second-degree murder.  [Id. at 1286].  In accordance with the Petitioner's decision, the Court denied the Government's request to give the second-degree murder instruction and instructed the jury that they could only find the Petitioner guilty of Count One if they found beyond a reasonable doubt that the Petitioner killed Smith with malice aforethought and after premeditation. [Trial Tr. at 1296-97, 1400-02].

On June 8, 2011, the jury found the Petitioner guilty of both first-degree murder and using a firearm during and in relation to a murder. [CR Doc. 86: Verdict]. The Court sentenced the Petitioner to a term of life imprisonment as to the first-degree murder offense and to a consecutive term of life imprisonment as to the firearm offense. [CR Doc. 99: Judgment].

The Petitioner appealed, challenging the sufficiency of the evidence against him as well as certain evidentiary rulings and arguing that the Court erred in failing to instruct the jury on the lesser-included offense of second-degree murder. The Fourth Circuit affirmed this Court's judgment, holding that the jury's verdict was supported by sufficient evidence and that this Court acted within its discretion in making the challenged evidentiary rulings. United States v. Lespier, 725 F.3d 437, 447-49 (4th Cir. 2013). The Fourth Circuit further held that this Court erred in failing to give the second-degree-murder instruction at the Government's request. The appellate court opined, however, that such error was invited by the Petitioner and, therefore, was not reversible. Id. at 450. The Supreme Court denied the Petitioner's request for a writ of certiorari on January 13, 2014. Lespier v. United States, 134 S. Ct. 974 (2014).

### D.    Post-Conviction Proceedings

#### 1.    Petitioner's Motion

On January 12, 2015, the Petitioner, through attorney David Belser, filed the present motion to vacate pursuant to 28 U.S.C. § 2255.  [CV Doc. 1].  In his motion, the Petitioner asserts three claims of ineffective assistance of counsel against Mr. McLean and Mr. Ferguson.   In Ground One, the Petitioner contends that counsel rendered ineffective assistance by advising the Petitioner to rescind his acceptance of the plea offer to second-degree murder without counsel having fully reviewed the discovery or investigated the matter and without advising the Petitioner that the Government could charge him with first-degree murder.  [Id. at 5].  In Ground Two, the Petitioner contends that counsel rendered ineffective assistance by advising the Petitioner to reject a plea bargain based on the Government's inability to prove its case of either first- or second-degree murder.  [Id. at 6].  In Ground Three, the Petitioner contends that counsel rendered ineffective assistance by failing to introduce at trial relevant evidence of the Petitioner's peacefulness.  [Id. at 8].

In support of his motion, the Petitioner submitted the Affidavit of his sister, Ida Lespier.  Ms. Lespier states in her Affidavit that after reviewing the discovery and interviewing witnesses, Ms. Sison had advised the Petitioner

to plead guilty to second-degree murder. [CV Doc. 1-4 at ¶ 5: I. Lespier Aff.]. She further states that Ms. Sison had estimated that the Petitioner would likely receive a guidelines sentence of 14 to 18 years, and that he would serve approximately 85% of that sentence. [Id. at ¶ 6].

Ms. Lespier states that shortly before the Petitioner's Rule 11 hearing, she and her mother met with Mr. McLean to seek a second opinion regarding the Petitioner's case. [CV Doc. 1-4 at ¶ 3: I. Lespier Aff.]. After listening to Ms. Lespier's description of the case, Mr. McLean advised her that "he could win the case," and that he kept saying, "They ain't got nothing on him." [Id. at ¶ 4]. Mr. McLean further opined that "there was no way the prosecution could convict [the Petitioner] of murder," as the prosecution could not prove that the Petitioner had even fired the gun. [Id. at ¶¶ 4, 8]. Finally, Mr. McLean opined, according to Ms. Lespier, that the Petitioner "should not plead guilty to second degree murder as he intended in his plea agreement." [Id. at ¶4].

As for Ms. Sison's estimated calculation of the likely sentence, Ms. Lespier states in her Affidavit that Mr. McLean said "Ms. Sison had lied and that [the Petitioner] would have to do all of [a] fourteen year sentence or whatever sentence he received." [Id. at ¶ 7]. Ms. Lespier further states that Mr. McLean repeatedly assured the family in other pretrial meetings that "we've got this, we've got this, we're bringing your boy home." [Id. at ¶ 8].

## 2. The Government's Response

The Government filed a Response opposing the Petitioner's motion. [CV Doc. 9]. In support of its Response, the Government submitted the Affidavit of Mr. McLean. In his Affidavit, Mr. McLean refutes Ms. Lespier's Affidavit, denying that he made any such statements to the Petitioner's family. Rather, he states that he has "always told any client, including [the Petitioner] that I could only do my best for him." [CV Doc. 9-1 at ¶ 8: McLean Aff.]. Mr. McLean further denied advising the Petitioner to reject any plea. [Id. at ¶ 9].

## 3. The Evidentiary Hearing

The Court conducted an evidentiary hearing on the Petitioner's § 2255 motion on October 23, 2015. At this hearing, Mr. McLean testified he first learned of the Petitioner's case from Mr. Ferguson, who called him and said that he wanted Mr. McLean to look at a case with him. [T. 73]. Thereafter, Mr. McLean met with the Petitioner's mother, Sherry Hornbuckle, on November 9, 2010, for approximately 30 minutes. [Id. at 73, 74]. Mr. McLean recalled that:

> [Ms. Hornbuckle] talked to me about what she understood the facts to be, what she understood happened that day that the lady died, his girlfriend died. I listened to what she had said. I was processing it in my head listening to the

circumstances surrounding the shootings in his house. I listened to the statements about how the girl was – what kind of person she was. I listened to the kind of person Ernie was and I processed all of that. Basically, I got what I felt like was at least an understanding from her what was at risk and what the totality of that event was in my mind anyway.

[T. 75]. Based on what he understood from the Petitioner's mother (who was not present at the time of the offense), Mr. McLean agreed to represent the Petitioner along with Mr. Ferguson. [Id.].

The Petitioner spoke to Mr. McLean for approximately five minutes on the day of his Rule 11 hearing in the holding cell of the federal courthouse. At that time, Mr. McLean advised the Petitioner that he would likely serve a full 18 years[4] if he pleaded to second-degree murder, but that in Mr. McLean's view, there was "no way" the Government could convict him for second-degree murder. [T. 15, 16, 37, 70, 91].

Mr. McLean testified that he did not discuss the specifics of the case with the Petitioner, but rather just asked for his version of what happened. [T. 77]. After Petitioner recounted his version of the events, Mr. McLean was satisfied that "it kind of dovetailed with what his mama said," so he decided

---

[4] The Petitioner testified that he understood from his prior counsel, Ms. Sison, that he was likely facing a term of imprisonment of 14 to 18 years if he pleaded to second-degree murder. [T. 14].

to represent him.[5]  [T. 76].  Mr. McLean further testified that he told the Petitioner that "he had a good shot at" acquittal, but he denied ever telling the Petitioner that he could get him acquitted.  [T. 87].

The Petitioner testified that based on Mr. McLean's advice, and specifically Mr. McLean's opinion that there was "no way" the Government could obtain a conviction for second degree murder, the Petitioner decided to withdraw his plea agreement.  [T. 70].  At the time, the Petitioner was under the impression that he was facing at most a term of imprisonment of 25 years. [T. 28, 34].  In deciding to contest the murder charge instead of pleading guilty, he "remembered saying so what's seven more years on top of 18?"  [T. 28].

It is undisputed that Mr. McLean and Mr. Ferguson did not meet with the Petitioner at any time between the canceled Rule 11 hearing on November 10, 2010 and the hearing at which the Petitioner withdrew his plea on November 19, 2010.  [Doc. 78-79].  Further, prior to the withdrawal of the plea agreement, Mr. McLean never reviewed any of the discovery made available by the Government.  [T. 90].  Mr. McLean never advised the

---

[5] Mr. McLean testified that if the Petitioner had told him a version of events different from what Ms. Hornbuckle had told him, he would have made the decision not to represent him.  [T. 76].

Petitioner that if he withdrew his plea, he could be charged with first-degree murder, which carried a mandatory sentence of life imprisonment. [T. 18, 91]. He also never advised the Petitioner that if he were convicted of the firearms charge, he could also receive a consecutive sentence of up to life imprisonment. [T. 19, 65]. In fact, Mr. McLean testified that at the time of the events in question, he was not aware that the firearms charge carried the potential for a life sentence. [T. 87-88]. Rather, he thought a conviction for the firearms offense would simply result in a "five year tack on," i.e., a five-year consecutive sentence. [T. 88].

The Petitioner testified that, had he been informed that he could be charged with first-degree murder and, if convicted, would receive a sentence of life imprisonment, he would have not withdrawn his assent to the Plea Agreement. [T. 24-25, 26-27]. The Petitioner further testified that had he been informed that he could receive a sentence of life in prison on the firearms charge alone, he would have persisted in his plea to second-degree murder pursuant to his written agreement, which provided for the dismissal of the firearms charge. [T. 27].

The Petitioner further testified that he was not aware that the Government's plea offer remained outstanding despite the withdrawal of his assent to the Plea Agreement and the filing of the Superseding Bill of

Indictment. Specifically, the Petitioner testified that when Ms. Sison asked to "strike" the Rule 11 hearing, the Petitioner assumed that this meant "that was it": that the plea offer was off the table, and that he was going to trial. [T. 43, 69]. Mr. McLean admittedly never advised the Petitioner that the plea offered by the Government was still open, even after the Petitioner was charged with first-degree murder. [T. 20, 92].

In February 2011, Mr. McLean and Mr. Ferguson met with AUSA Don Gast. At that meeting, Mr. McLean offered a plea to involuntary manslaughter, which the Government rejected. [T. 82, 102]. Mr. McLean could not recall if the Government offered any other type of plea at that time. [T. 83]. Mr. Ferguson recalled, however, that the Government verbally re-offered the plea to second-degree murder during that meeting. [T. 102]. Additionally, Mr. Ferguson testified that on February 23, 2011, he received an e-mail containing a written proposed plea agreement to second-degree murder. [T. 102-03]. Mr. McLean acknowledged that the Government e-mailed him the renewed plea agreement, but testified that he did not recall ever reading it:

> I actually saw some documents this morning about an e-mail that I was copied on, or whatever you call it, that actually went to Brad Ferguson. It came from the U.S. attorney's office. I can't tell you that I looked at it. At that point in time I'd never taken an e-

mail off of the computer. Okay? I had a lady that worked for me and I'd have her print something off and I'd read it.

Now I have actually learned how to take an e-mail and go push a thing up there that says "printer" and make it come off on the printing machine. Okay? But in 2010 and '11 I never read an e-mail on a computer. I can't tell you that I read that e-mail. I can't tell you I even saw it. I think it came from Don's office to Brad, the thing that I looked at today. I can't tell you that I read it. I certainly didn't tell Ernie about it because if I don't remember it -- and more than likely I didn't read it off the computer. I know I didn't pick up the phone and ask to talk to Ernie to tell him about it. Okay? I just -- so he never, from me, got that information because I don't even remember reading it.

[T. 92]. Mr. McLean could not recall if at any time prior to trial the Petitioner asked about the possibility of any sort of plea. [T. 83]. When asked whether the Petitioner indicated any unwillingness to plead and instead go to trial to "fight this charge," Mr. McLean testified as follows:

Truthfully, I don't know how to answer that question, I really don't. I think if – I know I didn't talk to him about any plea. Whether he wanted to plea or not, he didn't – I can't say that he mentioned it to me or not. I just can't tell you that, I really can't. I know what I told Don [Gast]. I don't even know, truthfully, if I even mentioned that to Ernie. You know, if I could get that [a plea to manslaughter] would you take it? I can't even say that that happened.

[T. 83-84].

For his part, Mr. Ferguson testified that he never discussed with the Petitioner the possibility that he could still plead to second-degree murder, although it was Mr. Ferguson's understanding that the second-degree murder plea offer had never been revoked. [T. 103, 105]. Mr. Ferguson did not recall having any substantive conversations with the Petitioner regarding likely sentences or plea offers, explaining that he "left what [he] considered to be major strategic information and/or discussions to be had between [Mr. McLean] and Mr. Lespier." [T. 101].

The Government does not dispute that the offer of a plea to second-degree murder and dismissal of the firearms charge remained available to the Petitioner, and that a formal plea agreement to that effect, identical to the one the Petitioner signed but later rescinded, was forwarded to the Petitioner's new counsel with only the names of counsel having been changed. [See T. 103-04].

### 4. Post-Hearing Briefs

As directed by the Court, the parties filed supplemental briefs following the evidentiary hearing. [Docs. 17, 20]. In his post-hearing brief, the Petitioner recasts his grounds for relief as follows. First, the Petitioner contends that counsel rendered ineffective assistance by allowing him to withdraw his assent to the Plea Agreement without first advising the

Petitioner that he could later be indicted for first-degree murder.  Second, the Petitioner contends that counsel rendered ineffective assistance by allowing him to withdraw his assent to a plea to second-degree murder without explaining to him he could still receive a sentence of life in prison if convicted of using a gun in the commission of a murder (a charge that would have been dismissed as part of the Plea Agreement) and without first reviewing the discovery and other evidence in this matter.  Third, the Petitioner contends that he received ineffective assistance because counsel failed to advise him that the Government's plea offer remained available even after the Superseding Bill of Indictment charging first-degree murder had been returned.  [Doc. 17].  In response to the Petitioner's new contentions, the Government maintains that the Petitioner has failed to carry his burden of demonstrating deficient performance by counsel or that he suffered any prejudice as a result of such performance.  [Doc. 20].

## II.    DISCUSSION

### A.    Ineffective Assistance of Counsel Standard

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel.  <u>See</u> U.S. CONST. art. VI.  In order to challenge a conviction based on the ineffective assistance of counsel, a petitioner has the burden of establishing that: (1)

defense counsel's performance was deficient, in that counsel's "representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms," and (2) the petitioner was prejudiced thereby, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

To establish deficient performance by counsel, a petitioner must overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As the Strickland Court cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id. at 689 (citation omitted). In the end, to prevail on a claim of ineffective assistance, a petitioner has the burden of showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687).

The Supreme Court has long recognized that the right to effective assistance of counsel extends to the plea negotiation process. See Padilla v. Kentucky, 559 U.S. 356, 373 (2010); McMann v. Richardson, 397 U.S. 759, 771 (1970). More recently, the Court endeavored to define the responsibilities and duties of counsel during plea negotiations in two seminal cases, Lafler v. Cooper, 132 S. Ct. 1376 (2012), and Missouri v. Frye, 132 S. Ct. 1399 (2012). In these cases, which were decided on the same day, the Court applied the well-established Strickland analysis to conclude that the right to effective assistance may be violated when counsel fails to give proper advice regarding the rejection of a plea offer, Lafler, 132 S. Ct. at 1384, or when counsel fails to communicate a formal plea offer, Frye, 132 S. Ct. at 1409. The instant case presents the Court with the task of applying the rationale of both Lafler and Frye to counsel's conduct in advising the Petitioner during the plea negotiation process.

## B.    Petitioner's Lafler Claim

The Court first turns to the Petitioner's claim that counsel was ineffective in advising him regarding the withdrawal of his assent to the Plea Agreement. The Supreme Court has acknowledged that defining the duties

and responsibilities of defense counsel in plea negotiations is "a difficult question." <u>Frye</u>, 132 S. Ct. at 1408. The Court, however, has noted that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable ...." <u>Strickland</u>, 466 U.S. at 688; <u>see also</u> <u>Frye</u>, 132 S. Ct. at 1408 (noting that although "the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides"). With respect to advising clients as to whether to accept or reject a plea offer, the American Bar Association standards state, in pertinent part, as follows:

> To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.

ABA Standards for Criminal Justice Pleas of Guilty, Standard 14-3.2(b) (3d ed. 1999).

Here, Mr. McLean admits, and the Court so finds, that he made no meaningful investigation or study of the case prior to advising the Petitioner regarding the withdrawal of his assent to the Plea Agreement. This was a

murder case based primarily on circumstantial evidence. To prove its case, the Government had to rely on inferential evidence, such as the angle of the shot that killed the victim and the manner in which the blood drained from the victim's body, in order to prove that this was a premeditated killing and not just an accidental discharge of a firearm during a domestic dispute. Petitioner's counsel, however, did not consider any of this circumstantial evidence prior to advising the Petitioner about rejecting the Government's plea offer; in fact, counsel freely admitted that he had not reviewed any of the discovery available to him and was instead proceeding solely on his understanding of the case as related to him by the Petitioner and his mother.

The testimony presented at the evidentiary hearing established that Mr. McLean met with Petitioner's mother the day before the scheduled Rule 11 hearing and heard her version of what occurred on the night of the murder. Mr. McLean then spoke to the Petitioner in a holding cell for approximately five minutes on the day of his scheduled Rule 11 hearing and confirmed that the Petitioner's version of the events was the same as his mother's.[6] Based on the information provided by the Petitioner and his

---

[6] While Mr. McLean was careful to ensure that the Petitioner's version of the events "dovetailed" with his mother's version, the consistency of their stories was inconsequential. Other than the victim herself, the Petitioner was the only party present at Smith's death. As such, any information that the Petitioner's mother had regarding the

mother, Mr. McLean told the Petitioner that "he had a good shot at" acquittal. [T. 87]. Significantly, Mr. McLean made this assessment without reviewing any of the discovery related to the case, despite the fact that such discovery was available for review through Petitioner's then-current counsel.

Mr. McLean's advice came at a critical juncture: when the Petitioner was deciding whether to withdraw his assent to a Plea Agreement that he had already signed and instead proceed to trial. Notably, the Petitioner did not speak further with either Mr. McLean or Mr. Ferguson prior to the status hearing before Judge Howell on November 19, 2010, when Mr. McLean announced to the Court that the Petitioner had decided to forego the plea and proceed to trial. Thus, this brief, five-minute meeting was the sum of the advice that the Petitioner received prior to withdrawing his assent to the Plea Agreement.

Standing alone, Mr. McLean's assessment of the likelihood of acquittal was not ineffective assistance *per se*. "[A]n erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance." Lafler, 132 S. Ct. at 1391. Here, however, Mr. McLean expressed this opinion based solely on hearing the Petitioner's story (either from the Petitioner

_____

events leading up to Smith's death were learned second-hand, presumably from the Petitioner himself.

and/or reiterated by his mother) and without examining any of the discovery available or otherwise investigating the case. While the Government's case was largely circumstantial, it was not weak. As the Fourth Circuit noted in its decision affirming the Petitioner's conviction and sentence, the evidence presented by the Government "permitted the jury to find ample incriminating facts supporting the two convictions . . . ." Lespier, 725 F.3d at 447. Mr. McLean, however, utterly failed to analyze any of the Government's evidence before advising the Petitioner about his plea. Without such analysis, Mr. McLean's advice was uninformed at best, and misleading at worst.

Adequate representation with regard to a proposed guilty plea requires not only investigation and study of the evidence, but also a meaningful analysis of the defendant's potential sentencing exposure. Specifically, the pertinent ABA Standard "contemplates that any plea offer will be assessed not only based on the maximum possible punishment in the event of a guilty plea, but also by comparison to the probable sentence the judge would impose after trial." Handley v. United States, 47 F. Supp. 3d 712, 717 (N.D. Ill. 2014) (quoting ABA Standards for Criminal Justice Pleas of Guilty, Commentary on Standard 14–3.2(b)). Here, not only did the Petitioner's counsel fail to conduct any meaningful analysis of the evidence, he never

made any attempt to compare the likely sentence which would result from a guilty plea pursuant to the Plea Agreement with the potential penalties that the Petitioner would be facing if he were to be convicted of second-degree murder and the firearms charge at trial. "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." Handley, 47 F. Supp. 3d at 718 (quoting United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992)).

The second-degree murder charge posed a potential maximum sentence of life imprisonment. 18 U.S.C. § 1111(b). The firearms offense posed a mandatory minimum consecutive sentence of at least ten years and a maximum consecutive term of life imprisonment. See 18 U.S.C. § 924(c)(1), (c)(1)(D)(ii), & (j)(1).[7] Pursuant to the terms of the Plea Agreement, the Petitioner would have pleaded guilty to second-degree murder, and the firearms charge would have been dismissed. Had the Petitioner accepted the Plea Agreement and pleaded guilty to second-degree murder, his base offense level would have been 38. U.S.S.G. § 2A1.2. He would have likely received a three-level reduction for acceptance

---

[7] The statute provides for a maximum possible sentence of death; however, the Government did not pursue the death penalty in this case.

of responsibility, resulting in a total offense level of 35. With a criminal history category of I, the resulting recommended Guidelines range would have been 168 to 210 months. U.S.S.G. § 5 Pt. A (Table).

If the Petitioner had proceeded to trial and been found guilty of second-degree murder, he would have lost the three-level reduction for acceptance of responsibility, resulting in a total offense level of 38 and a resulting recommended Guidelines range of 235 to 293 months on the second-degree murder charge. Id. If also convicted at trial of the firearms charge, the Petitioner would have faced a mandatory consecutive sentence, see 18 U.S.C. § 924(c)(1)(D)(ii), for which the recommended Guidelines range was also 235 to 293 months. U.S.S.G. § 2A2.1, App'x A. Thus, by rejecting the Government's plea offer and proceeding to trial, the Petitioner faced a total sentence as recommended by the Guidelines of 470 to 586 months' imprisonment (approximately 39 to 49 years).

Based on his meeting with Mr. McLean, the Petitioner was laboring under the erroneous impression that his maximum exposure if he proceeded to trial was a term of twenty-five years. In rejecting the Government's plea offer, the Petitioner recalled saying, "so what's seven more years on top of 18?" [T. 28]. While it is unclear where the Petitioner gained this erroneous impression, Mr. McLean made no attempt to provide him with correct

information.  Indeed, Mr. McLean admitted that he was not aware at the time of the full extent of the Petitioner's potential sentencing exposure.  Mr. McLean believed that the firearms charge posed a potential sentence of no more sixty months, when in reality the charge posed a mandatory minimum consecutive term of 120 months and the Guidelines would indicate a potential consecutive term of 235 to 293 months.  While counsel may have reasonably believed that the Petitioner had, in Mr. McLean's words, a "good shot" at acquittal, such a belief does not relieve his attorneys from their duty to explain the comparative sentence exposure between accepting the plea offer and proceeding to trial.

Merely miscalculating the potential Guidelines range is not ineffective assistance.  Counsel's error here, however, was not a mere miscalculation but a total failure to become informed regarding the application of the Guidelines, resulting in counsel advising the Petitioner based on a guess as to the likely sentence that was wildly incorrect.  Even with the degree of counsel's error, it is only when coupled with his other errors regarding the evidence that counsel's performance rises to the level of ineffectiveness.

The Government contends that any deficiency in counsel's performance in this regard was alleviated by the fact that the Court advised the Petitioner at his arraignment on the Bill of Indictment of the maximum

penalties he was facing for these offenses.  If this were counsel's only error, the Government would be correct: the Petitioner would not be entitled to any relief simply because his counsel failed to advise him of the maximum potential penalties before advising him regarding the withdrawal of his assent to the Plea Agreement.  Here, however, counsel's lack of knowledge of both the mandatory and likely sentence exposure in the event of a conviction at trial, coupled with his cavalier approach to the evidence, rendered his advice to the Petitioner regarding the withdrawal of his assent to the plea offer deficient.

In addition to failing to provide any meaningful analysis of the evidence or advise the Petitioner regarding his potential sentencing exposure at trial, at no time did Petitioner's counsel advise him of the possibility that upon withdrawing his assent to the Plea Agreement, the Petitioner could face a more serious charge (i.e., first-degree murder) and that the firearms charge would not be dismissed.  Granted, this deficient advice would have been inconsequential had counsel later properly advised the Petitioner regarding the strengths and weaknesses of the Government's case and then counseled him regarding the potential benefits of the still-outstanding plea offer.  As shall be discussed in greater detail later in this opinion, however, counsel never conveyed to the Petitioner that the plea offer was still

available. As a result, counsel's deficient performance regarding the rejection of the plea offer was never remedied.

Counsel's errors continued to compound following the filing of the Superseding Bill of Indictment. Once the Petitioner was charged with first-degree murder, counsel again failed to discuss with the Petitioner the potential penalties that he would be facing if he were to be convicted at trial. While the Petitioner may have been advised of the maximum potential penalties by the Court at his arraignment, counsel never made any attempt to compare the likely sentence which would result from the entry of the Plea Agreement (14 to 18 years) with the likely sentence which could result from a conviction for first-degree murder and the use of a firearm during a murder. With the filing of the Superseding Bill of Indictment, the Petitioner faced a potential sentence of *two consecutive life sentences* – a punishment far more severe than what he would have faced under the Plea Agreement. It is undisputed, however, that Mr. McLean and Mr. Ferguson never advised the Petitioner prior to the withdrawal of his assent to the Plea Agreement -- or indeed at any time prior to sentencing -- of the sentence he would likely receive in the event of a conviction for both first-degree murder and the firearms charge.

The Petitioner made a critical decision – the withdrawal of his assent to an executed Plea Agreement – based on advice that was given without meaningful investigation or study of the evidence or of the applicable Guidelines. The Petitioner decided to withdraw his assent to the Plea Agreement without being counseled about the comparative sentence exposure between accepting the plea and proceeding to trial and without being advised that he could be charged with more serious offenses. Then, once the Petitioner withdrew his assent to the plea offer and was charged with first-degree murder, counsel never provided him with any comparative analysis of the sentence likely to result from accepting the plea offer and the sentence likely to result from a conviction at trial. While none of these actions would necessarily constitute deficient performance standing alone, the accumulation of counsel's errors resulted in the Petitioner receiving assistance that was clearly deficient. For these reasons, the Court concludes that the Petitioner has carried his burden of demonstrating that counsel provided ineffective assistance in advising the Petitioner regarding the withdrawal of his assent to the Plea Agreement. See Lafler, 132 S. Ct. at 1384.

Having determined that counsel's performance was deficient, the Court turns to the prejudice prong of <u>Strickland</u>. To establish prejudice in the context of rejecting a proposed plea offer, a petitioner

> must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (<u>i.e.</u>, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

<u>Lafler</u>, 132 S. Ct. at 1385.

The Government contends that there is no credible evidence in the record to show that the Petitioner would have pleaded guilty, as the record indicates that the Petitioner believed that the shooting was an accident and thus he was not guilty of murder, either in the second-degree or otherwise. Contrary to the Government's argument, however, there *is* credible evidence in the record tending to show a reasonable probability that the Petitioner would have accepted the plea offer upon proper counseling and advice: he had previously done so in this very case. The Petitioner had agreed to, signed, and filed a Plea Agreement, and the parties were prepared to go forward with a Rule 11 hearing on November 10, 2010. It was not until the

Petitioner spoke with Mr. McLean, mere minutes before that hearing, that the Petitioner expressed any reservation about entering a plea of guilty, and he expressed such reservations based on Mr. McLean's uninformed assessment of the case.

Further, the Court finds that there is a reasonable probability that the Government would have not have withdrawn the plea offer. The Government had signed a Plea Agreement with the Petitioner, and even after the Petitioner withdrew his assent and superseding charges were filed, the Government continued to offer a plea on the same terms to which the Petitioner had previously agreed. The Government even went so far as to make another formal offer of the same Plea Agreement in February 2011. While the formal Plea Agreement document that was offered to Mr. McLean and Mr. Ferguson is not contained in the record, the Government concedes that the terms of the re-offered Plea Agreement were identical to the terms of the Plea Agreement that the parties signed and filed with the Court in November 2010. [See T. 103-04]. That Plea Agreement, which remains part of the record, is a relatively standard plea agreement, and there is nothing about its terms that would have given the Court pause in accepting it. While the Government had ample evidence to support a charge of first-degree murder, the evidence of the Petitioner's premeditation was largely

circumstantial; given the circumstantial nature of the Government's case, the Court would have had no problem with accepting a plea to the lesser included offense of second-degree murder. Finally, as is explained above, the conviction and sentence resulting from the terms of the proposed Plea Agreement would have been far less severe than under the Judgment and sentence that were ultimately imposed. For these reasons, the Court concludes that the Petitioner has carried his burden of establishing prejudice as a result of counsel's deficient performance. Having demonstrated both deficient performance and prejudice, the Petitioner is entitled to relief on his claim of ineffective assistance of counsel with regard to the advice he received in withdrawing his assent to the Plea Agreement.

### C.    Petitioner's <u>Frye</u> Claim

In his post-hearing brief, the Petitioner argues for the first time that counsel was also ineffective in failing to tell him that the Government's offer of a guilty plea to second-degree murder remained available even after the filing of the Superseding Bill of Indictment charging him with first-degree murder.  [Doc. 17 at 13-16].

This claim was not asserted in the Petitioner's original Motion to Vacate, nor was it raised prior to the expiration of the one-year statute of

limitations set forth in 28 U.S.C. § 2255(f).[8]  "When a petitioner files a timely § 2255 motion, and then later files an untimely amended or supplemental motion that raises additional claims, the untimely claims are barred by the statute of limitations unless they 'relate back' to the original motion under Federal Rule of Civil Procedure 15(c)."  Espinosa v. United States, 330 F. App'x 889, 891 (11th Cir. 2009).  Under Rule 15(c), a claim "relates back" if it "arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B); see also Mayle v. Felix, 545 U.S. 644, 664 (2005) (holding that claims relate back if "tied to a common core of operative facts" underlying the claims asserted in original pleading).

Here, the Petitioner's original Motion to Vacate asserts claims related to counsel's deficient advice regarding the withdrawal of his assent to the Plea Agreement and counsel's failure to advise him that he could possibly be charged with first-degree murder if he rejected the Government's plea offer.  The Petitioner's post-hearing claim, that counsel failed to convey the availability of a plea deal once the possibility of a first-degree murder charge

---

[8] Notably, the Government asserts no objection to this newly raised claim in its responsive brief, arguing only that the Petitioner's failure to assert this claim in his original motion to vacate somehow "undermines his credibility."  [Doc. 20 at 10 n.1].

became a reality, clearly relates to the same core of operative facts: namely, counsel's deficient advice during the course of pretrial plea negotiations. Accordingly, the Court concludes that the Petitioner's claim as asserted in his supplemental post-hearing brief relates back to his original Motion to Vacate.

Having determined that the Petitioner's claim relates back and therefore is not barred as being untimely, the Court will now consider the merits of the claim. In the seminal case of <u>Missouri v. Frye</u>, the Supreme Court held that "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." 132 S. Ct. 1399, 1408 (2012).

In <u>Frye</u>, the Supreme Court recognized a duty on the part of counsel to convey "formal" plea offers. Notably, <u>Frye</u> does not address whether the Sixth Amendment is violated when counsel fails to advise the defendant that a previously rejected plea offer is still available. The Court need not decide, however, whether counsel's failure to advise the Petitioner of the continued availability of the plea offer constitutes deficient performance because in the present case, the Government formally renewed the subject plea offer approximately three months before trial. While there is some dispute as to

whether the plea offer was orally conveyed to defense counsel, it is undisputed that a draft Plea Agreement was e-mailed to both Mr. McLean and Mr. Ferguson in February 2011. The terms of this proposed Plea Agreement were identical to the terms set forth in the original Plea Agreement filed with the Court in November 2010; only the names of defense counsel were changed on the document. It is further undisputed that this plea offer was not conveyed to the Petitioner by his attorneys. Mr. Ferguson acknowledged receiving the renewed plea offer but deferred to Mr. McLean on matters of trial strategy and plea negotiation. For his part, Mr. McLean recalls receiving the e-mail but testified that he did not know how to open the attachment and therefore did not read it. As a result, neither attorney discussed the renewed plea offer with the Petitioner.

In order to prevail on an ineffective assistance of counsel claim based upon the failure to communicate a formal plea offer, a petitioner must demonstrate "a reasonable probability that [he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." Frye, 132 S. Ct. at 1409. Additionally, a petitioner must show a reasonable probability that the plea would have been entered and "that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." Id. Here, the Petitioner

has satisfied this burden, as he testified that had he known that the plea offer to second-degree murder was still available, he would have accepted it once he was charged with first-degree murder. The Court finds the Petitioner's testimony to on this point to be credible. The Court already has determined that the Petitioner has shown a reasonable probability that the Plea Agreement would have been accepted by the Court, and there is nothing to indicate that the Government would have withdrawn its offer in light of subsequent events.

Finally, for the reasons stated above with respect to his first ineffective assistance claim, the Petitioner has demonstrated that he would have received a far more favorable conviction and sentence under the terms of the Plea Agreement than he did as a result of the trial. The prejudice resulting from counsel's failure to convey the renewed plea offer, however, is even more egregious. By giving faulty advice on the withdrawal of the assent to the Plea Agreement, counsel caused the Petitioner to forego a plea deal, which likely would have resulted in a sentence of 14 to 18 years. By failing to convey the renewed plea offer, counsel deprived the Petitioner of the opportunity to avoid the imposition of *two consecutive life sentences*. However much confidence counsel may have had in his ability to secure an acquittal at trial, the stakes were incredibly high, and the Petitioner was

entitled to consider the Government's plea offer in order to avoid such a devastating outcome.

As the Petitioner has demonstrated both deficient performance and prejudice with respect to counsel's failure to convey a formal plea offer, the Court concludes that the Petitioner is entitled to relief under this claim as well.[9]

### D.  Appropriate Remedy

Having determined that the Petitioner received ineffective assistance of counsel with regard to the advice received regarding the withdrawal of his plea agreement as well as the failure to convey a formal plea offer, the Court now turns to the appropriate remedy to be imposed.

Where a defendant has shown a reasonable probability that he would have accepted a plea offer but for counsel's deficient performance, and the offer was for a plea to a count less serious than the ones for which the defendant was convicted at trial, then the appropriate remedy is to require the Government to reoffer the plea proposal.  Lafler, 132 S. Ct. at 1389. Here, the Court finds that the Petitioner has demonstrated a reasonable

---

[9] Having determined that the Petitioner is entitled to relief on these two ineffective assistance claims, the Court need not address the other claims asserted in the Petitioner's motion to vacate.  The Court nevertheless has reviewed these claims and has determined that they are without merit.

probability that he would have accepted the Government's plea offer but for counsel's deficient performance. Further, the Petitioner has demonstrated that the Government's offer was for a plea to one count of second-degree murder, a charge much less serious than the ones for which the Petitioner was convicted at trial. Accordingly, the Court will direct the Government to reoffer the plea to the Petitioner. Once the plea offer has been made, the Court will then exercise its discretion to either vacate the conviction and accept the plea or leave the conviction undisturbed. See id.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Government is hereby **DIRECTED** to reoffer its plea proposal to the Petitioner within thirty (30) days of the entry of this Order. The Petitioner shall advise the Court within thirty (30) days thereafter as to whether he intends to accept the plea offer.

**IT IS SO ORDERED.**

Signed: June 17, 2016

Martin Reidinger
United States District Judge